# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# MONROE DIVISION

| | |
|---|---|
| SHAMIKA BENJAMIN WHITE | CIV. ACTION NO. 3:21-00455 |
| VERSUS | JUDGE TERRY A. DOUGHTY |
| KILOLO KIJAKAZI, ACTING COMMISSIONER, U.S. SOCIAL SECURITY ADMINISTRATION | MAG. JUDGE KAYLA D. MCCLUSKY |

## REPORT AND RECOMMENDATION

Before the court is Plaintiff' petition for review of the Commissioner's denial of social security disability benefits.   The district court referred the matter to the undersigned United States Magistrate Judge for proposed findings of fact and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C).   For the reasons assigned below, it is recommended that the decision of the Commissioner be **REVERSED and REMANDED for further proceedings.**

## Background & Procedural History

Shamika Benjamin White filed the instant application for Title II disability insurance benefits on December 16, 2017.   (Tr. 120, 306-312).   White, who was 41 years old at the time of the second administrative hearing, asserted a disability onset date of November 5, 2017, because of bipolar depression, anxiety, "PVC," and hypertension.   *See* Tr. 355, 363.   The state agency denied the claim initially on July 16, 2018.   (Tr. 100-116, 138-141).   Thereafter, White requested and received a February 6, 2019, hearing before an Administrative Law Judge ("ALJ") (Tr. 42-69).   In a May 16, 2019 written decision, the ALJ determined that White was not disabled under the Social Security Act, finding at step five of the sequential evaluation process that she was able to make an adjustment to work that exists in significant numbers in the national economy.   (Tr. 117-127).   White petitioned the Appeals Council to review the unfavorable

decision.   On February 6, 2020, the Appeals Council granted the request for review, vacated the ALJ decision, and remanded the case for further proceedings, because the prior ALJ failed to properly evaluate or address certain medical opinions.   (Tr. 132-136).

Pursuant to the remand order, a new ALJ held a second administrative hearing on July 9, 2020.   (Tr. 71-99).   However, in a September 14, 2020 written decision, the ALJ again determined that White was not disabled under the Social Security Act, finding at step five of the sequential evaluation process that she was able to make an adjustment to work that exists in significant numbers in the national economy.   (Tr. 7-20).   White appealed the adverse decision to the Appeals Council.   On January 6, 2021, however, the Appeals Council denied White's request for review; thus, the ALJ's decision became the final decision of the Commissioner. (Tr. 1-3).

On February 24, 2021, White filed the instant, pro se complaint for judicial review of the Commissioner's final decision.   Following submission of the administrative transcript and supporting memoranda, the matter is now before the court.

### Standard of Review

This court's standard of review is (1) whether the final decision is supported by substantial evidence, and (2) whether the Commissioner applied the proper legal standards to evaluate the evidence.   *Keel v. Saul*, 986 F.3d 551, 555 (5th Cir. 2021) (citation omitted).   The Supreme Court has emphasized that

> [t]he phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding.   Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations.   And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla."   It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a

2

conclusion."

*Biestek v. Berryhill*, ___ U.S.___, 139 S.Ct. 1148, 1154 (2019) (internal citations omitted).   The

reviewing court may not reweigh the evidence, try the issues *de novo*, or substitute its judgment

for that of the Commissioner.   *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).

Upon finding substantial evidence, the court may only review whether the Commissioner

has applied proper legal standards and conducted the proceedings consistently with the statute

and regulations.   *Carter v. Heckler*, 712 F.2d 137, 140 (5th Cir. 1983).   In other words, where

the Commissioner's decision is supported by substantial evidence, the findings therein are

conclusive and must be affirmed – *unless* the Commissioner applied an incorrect legal standard

that materially influenced the decision.   *See* 42 U.S.C. § 405; *Newton v. Apfel*, 209 F.3d 448,

452 (5th Cir. 2000); *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001).

## Determination of Disability

Pursuant to the Social Security Act ("SSA"), individuals who contribute to the program

throughout their lives are entitled to payment of insurance benefits if they suffer from a physical

or mental disability.   *See* 42 U.S.C. § 423(a)(1)(D).   The SSA defines a disability as the

"inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than 12 months . . ."   42 U.S.C. §

423(d)(1)(A).   A disability may be based on the combined effect of multiple impairments which,

if considered individually, would not be of the requisite severity under the SSA.   *See* 20 C.F.R.

§ 404.1520(a)(4)(ii).   Based on a claimant's age, education, and work experience, the SSA

utilizes a broad definition of substantial gainful employment that is not restricted by a claimant's

previous form of work or the availability of other acceptable forms of work.   *See* 42 U.S.C. §

423(d)(2)(A).

The Commissioner of the Social Security Administration has established a five-step sequential evaluation process that the agency uses to determine whether a claimant is disabled under the SSA. *See* 20 C.F.R. §§ 404.1520, 416.920. The steps are as follows,

(1)     An individual who is performing substantial gainful activity will not be found disabled regardless of medical findings.

(2)     An individual will be found not disabled if he or she does not have a "severe impairment," or a combination of impairments that is severe, and of the requisite duration.

(3)     An individual whose impairment(s) meets or equals a listed impairment in [20 C.F.R. pt. 404, subpt. P, app. 1], and meets the duration requirement, will be considered disabled without the consideration of vocational factors.

Before proceeding to step four, the Commissioner assesses the individual's residual functional capacity, which is used at both step four and step five to evaluate the claim.

(4)     If an individual's residual functional capacity is such that he or she can still perform past relevant work, then a finding of "not disabled" will be made.

(5)     If an individual is unable to perform past relevant work, then other factors including age, education, past work experience, and residual functional capacity must be considered to determine whether the individual can make an adjustment to other work in the economy. If the individual can make such an adjustment, then he or she will be found not disabled. If the individual is unable to adjust to other work, then he or she will be found disabled.

*See Boyd v. Apfel*, 239 F.3d 698, 704 -705 (5th Cir. 2001); 20 C.F.R. §§ 404.1520, 416.920.

When a finding of "disabled" or "not disabled" may be made at any step, a decision will be rendered at that point without proceeding to the remaining steps. 20 C.F.R. '§ 404.1520, 416.920; *Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990). "The claimant bears

the burden of proof on the first four steps, but the Commissioner bears the burden on the fifth step." *Salmond v. Berryhill*, 892 F.3d 812, 817 (5th Cir. 2018) (citation omitted).

## The ALJ's Findings

### I.    Steps One, Two, and Three

The ALJ determined at step one of the sequential evaluation process that the claimant did not engage in substantial gainful activity during the relevant period.   (Tr. 13).   At step two, she found that the claimant suffered severe impairments of degenerative disc disease, obesity, affective disorder, history of substance abuse, and PTSD.   *Id*.[1]   She concluded, however, that the impairments were not severe enough to meet or medically equal any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4, at step three of the process.   (Tr. 13-15).

### II.    Residual Functional Capacity

The ALJ next determined that the claimant retained the residual functional capacity ("RFC") to perform light work,[2]  except no climbing ladders, ropes, or scaffolds; can occasionally climb ramps/stairs; occasional stooping; no unprotected heights or hazardous

---

[1]  The ALJ further determined that the claimant's medically determinable impairments of hypertension, thyroid gland disorder, and gastritis were not severe.   *Id*.

[2]  Light work entails:
> . . . lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. §§ 404.1567(b), 416.967(b).

mechanical parts; unskilled work, including the ability to understand, remember, and carry out simple, routine instructions and tasks; make simple work related decisions; and respond appropriately to occasional routine changes in the work setting.  (Tr. 15-18).  The claimant is able perform job tasks independently, appropriately, and at a consistent pace in goal-oriented work in which job tasks do not have to be completed within a strict time deadline.  *Id*.  The claimant can have occasional interaction with supervisors, and coworkers, and less than occasional interaction with the general public.  *Id*.

## III.    Steps Four and Five

With the assistance of a vocational expert ("VE") the ALJ determined at step four of the sequential evaluation process that the claimant was unable to return to past relevant work.  (Tr. 18-19).  Accordingly, she proceeded to step five.  At this step, the ALJ determined that the claimant was a younger individual, with a high school education.  *Id*.  Transferability of skills was not material to the decision.  *Id*.

The ALJ next observed that given the claimant's vocational factors, and if she had an RFC that did not include any non-exertional limitations, then the Medical-Vocational Guidelines would direct a finding of not disabled.  20 C.F.R. §§ 404.1569, 416.969; Rule 202.21, Table 2, Appendix 2, Subpart P, Regulations No. 4; Tr. 19-20.  However, because the claimant's RFC *did* include non-exertional limitations, the ALJ consulted a VE to determine whether, and to what extent the additional limitations eroded the occupational base for work.  *Id*.  In response, the VE identified the representative jobs of **ironer**, *Dictionary of Occupational Titles* ("DOT") Code # 590.685-042; **copy machine operator**, DOT # 207.685-014; **marker**, DOT # 209.587-034; **addresser**, DOT # 209.587-010; **document preparer**, DOT # 249.587-018; and **nut sorter**, DOT # 521.687-086, that were consistent with the ALJ's RFC and the claimant's

6

vocational profile.   (Tr. 18-19, 93-97).[3]

### Non-Exhaustive Chronology of Relevant Medical Evidence

On August 8, 2017, White saw her primary care physician, Michael Phillips, M.D., for complaints of right upper back pain and anxiety.   (Tr. 499-502).   The pain was sharp and intermittent.   *Id.*   He ordered an x-ray of the cervical spine and put her back on Lexapro.   *Id.*

White returned to Dr. Phillips on November 1, 2017, with complaints of back pain.   (Tr. 507-510).   Phillips surmised that if it was not her gallbladder, then she likely was just having muscle spasms.   *Id.*

On November 21, 2017, White underwent a psychiatric evaluation with Guy Brannon, M.D., pursuant to her admission to Brentwood Hospital.   (Tr. 460-464).   She was admitted because of decreased activities of daily living, failed outpatient therapy and to clarify her diagnosis.   *Id.*   Her chief complaint was that she was emotionally upset.   *Id.*   She voluntarily presented to Brentwood Hospital for mood swings and trouble sleeping.   *Id.*   She was upset with her husband because of his lack of affection, etc.   *Id.*   Her husband felt like she was having a nervous breakdown.   *Id.*   She presented as upset, irritable, and uncooperative.   *Id.*   She met the criteria for mood swings, but did not meet the criteria for bipolar disorder, major depressive disorder, stress disorder, agoraphobia, etc.   *Id.*   She was not oriented to date, place, or situation. *Id.*   Her judgment was inappropriate.   *Id.*   Her insight was absent.   *Id.*   Her mood/affect was

---

[3] The VE responded that for the ironer, copy machine operator, marker, addresser, document preparer, and nut sorter jobs there were 252,000, 18,000, 360,000, 5,900, 47,000, and 4,200 positions available nationwide, respectively.   (Tr. 19-20, 93-97).   This incidence of work constitutes a significant number (and range) of jobs in the "national economy."   42 U.S.C. § 423(d)(2)(A); *Johnson v. Chater*, 108 F.3d 178, 181 (8th Cir. 1997) (200 jobs at state level and 10,000 nationally, constitute a significant number).

irritable and blunted.  *Id.*  She denied auditory and/or visual hallucinations.  *Id.*  Her memory was impaired.  *Id.*  Brannon diagnosed White with a severe, unspecified mood disorder.  *Id.*

On November 25, 2017, Dr. Brannon discharged White from the hospital.  (Tr. 468-470).  At that time, White was alert, oriented, and doing well.  *Id.*  Her memory and concentration were good.  *Id.*

On December 5, 2017, White returned to Dr. Phillips with complaints of depression. (Tr. 512-515).  Phillips started her on Cymbalta.  *Id.*

White saw psychiatrist, Lionel Guillaume, M.D., on at least a monthly basis from December 12, 2017, through April 2018.  (Tr. 547-548).  Unfortunately, his handwritten notes are difficult to decipher.  *Id.*

On December 20, 2017, White was seen by John Mandrell, M.D., for complaints of "picking at skin."  (Tr. 516-519).  She had been treated three times for scabies.  *Id.*  Mandrell diagnosed prurigo and started her on a topical steroid.  *Id.*

On March 1, 2018, White saw Dr. Phillips for complaints of back pain.  (Tr. 520-522). Phillips diagnosed bipolar disorder, prurigo, and upper respiratory infection.  *Id.*

White returned to Dr. Phillips on March 28, 2018 for follow-up because she was not sleeping well.  (Tr. 574-577).  Review of symptoms indicated no depression.  *Id.*  Phillips diagnosed insomnia, bipolar depression, and hypertension.  *Id.*  He adjusted her medication and gave her Vistaril for insomnia.  *Id.*

On March 27, 2018, White saw Peter Campbell, M.D. at the Spine Institute of Louisiana. (Tr. 538-540).  White reported back pain for the past two years.  *Id.*  Her pain had started in the thoracic spine but had since migrated to the lower back.  *Id.*  She described her pain as a 5-6

8

on a ten-point scale on a daily basis.   *Id.*   X-rays indicated degenerative disk disease with likely a collapsed disk at L5-S1.   *Id.*   Campbell referred her for an MRI of the lumbar spine.   *Id.*

A March 30, 2018 MRI of the lumbar spine showed mild disk bulge at L3-4, but at L5-S1 there was a congenitally absent pedicle on the right side or possibly even a conjoined nerve root. (Tr. 541-542).

White returned to Dr. Campbell on April 13, 2018, for follow-up.   (Tr. 543-545). Campbell diagnosed back pain and segmentation abnormality L5-S1, with possible foraminal stenosis.   *Id.*   She needed a CT scan.   *Id.*   She had degenerative disk disease at three of the disks in the lumbar spine.   *Id.*   He did not think that surgical intervention would prove fruitful. *Id.*   He gave her a script for Lyrica.   *Id.*

On May 10, 2018, the state agency sent White for a consultative mental clinical interview with Sherry Rumby, LPC.   (Tr. 553-558).   White's chief complaint was that she heard people talking to her and saw people in her house that were not there.   *Id.*   She also observed or felt bugs on her when there were none.   *Id.*   She became angry enough at one point to hit a couple of people.   *Id.*   She was unable to maintain her house as she did before in terms of cooking and housekeeping.   *Id.*   She was unable to socialize with family members for the most part.   *Id.* However, she was able to clean the house and walk the treadmill.   *Id.*   Her thought processes were scattered.   *Id.*   Her mood was labile and speech was forced.   *Id.*   Her judgment and insight were fair, but probably poor when stressed.   *Id.*   Rumby concluded that White "was not in any way . . . stable enough to work at this time."   *Id.*   Rather, she seemed to be bordering on psychotic much of the time.   *Id.*   At that time, she might pose a danger to herself and others in a work situation.   *Id.*   While she might have been a good worker in the past, Rumby observed

that with her current condition, which included rapid cycling moods, delusional thinking, and flashbacks, she would put herself and others at risk until she had more treatment. *Id.* Rumby recommended that she not return to work until she demonstrated to her doctor that she was able to function more independently and with more stability. *Id.*

White returned to Dr. Phillips on June 19, 2018, for her annual checkup. (Tr. 578-582). Phillips noted that she had been seeing a psychiatrist for her bipolar disorder. *Id.* White felt like her moods had been pretty stable. *Id.* Review of systems indicated no depression. *Id.* Phillips diagnosed hypertension. *Id.*

On July 16, 2018, non-examining state agency psychologist, Joseph Kahler, Ph.D., completed a psychiatric review technique wherein he found that White had depressive and bipolar related disorders that moderately affected her functioning. (Tr. 109-110).

Kahler also reviewed the record and completed a mental RFC in which he indicated that White was not significantly limited in her ability to understand and remember very short and simple instructions but was moderately limited in her ability to understand and remember detailed instructions. (Tr. 112). He further found that White's ability to carry out detailed instructions and to maintain attention and concentration for extended periods was moderately limited, as was her ability to perform activities within a schedule, maintain regular attendance, and to be punctual. *Id.* However, she was not significantly limited in her ability to work in proximity to others without being distracted by them. *Id.* White might experience exacerbation of symptoms of depressed mood or hypomania that interrupted the occasional workweek. *Id.* Moreover, her ability to accept instructions and respond appropriately to criticism from supervisors was moderately limited. *Id.* However, she should be able to tolerate and benefit

10

from helpful, respectfully offered advice and limits, with no difficulty accepting instruction.  *Id.*
She appeared capable of moderately complex work in a relatively low stress environment with
limited social demands.  *Id.*  With continued treatment adherence, Kahler opined that White's
limitations were likely to abate.  *Id.*

On August 15, 2018, White underwent an initial assessment and diagnostic impression at
Ray of Light Counseling.  (Tr. 629-630).  White reported anxiety symptoms, hallucinations,
and just not feeling quite right.  *Id.*  She further stated that she was unable to leave the house
some days and unable to get out of bed most days.  *Id.*  She explained that she was able to work
and care for others one day, but not the next.  *Id.*  She also reported auditory and visual
hallucinations.  *Id.*  She showed symptoms of PTSD from her childhood with some psychosis.
*Id.*  The therapist suggested using EMDR to process her memories.  *Id.*

In a September 13, 2018 to whom it may concern letter, Ginger Ray, LPC, wrote that
White had been receiving individual counseling with Ray of Light since August 15, 2018 to
work on her diagnosis of post-traumatic stress disorder ("PTSD").  (Tr. 565).  She added that
White seemed to struggle with obsessive negative thoughts, auditory and visual hallucinations,
and catatonic behavior at times.  *Id.*

White returned to Dr. Phillips on November 27, 2018 for cancer screening.  (Tr. 596-
600).  Phillips noted that White still was battling her bipolar disorder.  *Id.*  She had been
unable to work.  *Id.*  Otherwise, she did not have any other new complaints.  *Id.*  She had no
depression.  *Id.*

On December 12, 2018, Ginger Ray, LPC, completed a mental residual functional
capacity questionnaire wherein she indicated that White had marked limitations in activities of

daily living, marked difficulties in maintaining social functioning, severe deficiencies of concentration, persistence, or pace; four or more episodes of decompensation in work or work-like settings; plus severe or marked limitations in virtually every mental functional capacity. Ray indicated that White could not sustain work for eight-hour days, five days per week.   (Tr. 602-604).

White returned to Dr. Guillaume at least monthly between September-December 2018. (Tr. 606-607).   She claimed to be doing well at the September visit.   *Id.*   She had no audio-visual hallucinations.   *Id.*   On October 30 she reported that she was sleeping well but was more depressed.   *Id.*   She had no audio-visual hallucinations but was positive for paranoia.   *Id.*   She also was positive for mood swings.   *Id.*   On November 19, 2018, White reported that she was seeing a counselor twice per week and was less depressed.   *Id.*   On December 10, 2018, she reported frequent anger episodes and claimed to be hearing a man calling her name.   *Id.*   On the plus side, she had no visual hallucinations.   *Id.*

On January 8, 2019, White went to the emergency room for problems with her sixth vertebrae and explained that her doctor wanted her to get an MRI, but she did not have money for the copay.   (Tr. 616-621).   White added that she was out of pain medication and did not know what else to do but go there.   *Id.*   She reported that her pain was an eight on a ten-point scale, but, ten out of ten at its worst.   *Id.*   She received a Toradol shot.   *Id.*   White later reported to the physician that her pain symptoms were moderate at worst and that she had experienced similar symptoms in the past.   *Id.*   Upon examination, White had 5/5 motor strength in all extremities.   *Id.*   Her back pain was mild, but painful with range of movement.   *Id.*

White returned to the emergency room on January 20, 2019, for complaints of anxiety and a panic attack that she was unable to control.  (Tr. 623-627).   At their worst, the symptoms were moderate.   *Id.*   She was diagnosed with a panic attack, given Ativan, and discharged to home.   *Id.*

On January 22, 2019, White saw Dr. Phillips for complaints of back pain and left-sided numbness.   (Tr. 609-613).   She had no depression, full range of motion in her shoulder and normal strength.   *Id.*   Phillips diagnosed, *inter alia*, bipolar disorder.   *Id.*

On June 20, 2019, White underwent a psychiatric evaluation with John Wagner, M.D. (Tr. 725-727).   He noted that White had a history of depression and mood instability.   *Id.* Wagner noted that her problems were mood instability, with depression.   *Id.*   He diagnosed bipolar – I mixed and to rule out PTSD.   *Id.*   He assigned a current GAF of 60.   *Id.*[4]

On July 9, 2019, White returned to Dr. Phillips for low back pain.   (Tr. 672-676).   She stated that she could not afford to do back surgery.   *Id.*   Lyrica has helped her in the past.   *Id.* She reported a lot of burning and tingling in both lower legs.   *Id.*   Her straight leg was negative. *Id.*   She had mild pain with rotation.   *Id.*   Phillips diagnosed degenerative disk disease of the back.   *Id.*

On July 16, 2019, White returned to Dr. Wagner.   (Tr. 724).   White admitted to seeing

---

[4] "GAF is a standard measurement of an individual's overall functioning level 'with respect only to psychological, social, and occupational functioning.'"   *Boyd*, 239 F.3d at 701 n.2 (citing American Psychiatric Ass'n Diagnostic and Statistical Manual of Mental Disorders at 32 (4th ed. 1994) (DSM-IV)). A GAF of 51-60 is defined as "**[m]oderate symptoms** (e.g., flat affect and circumstantial speech, occasional panic attacks) **OR moderate difficulty in social, occupational, or school functioning** (e.g., few friends, no friends, unable to keep a job).   DSM-IV, pg. 32.

things sometimes.  *Id.*  Her mood was anxious.  *Id.*  Her insight and judgment were fair.  *Id.*  Wagner diagnosed bipolar disorder – mixed and PTSD.  *Id.*

White next saw Dr. Wagner on August 13, 2019.  (Tr. 723).  Her mood was depressed.  *Id.*  She had no hallucinations.  *Id.*  Insight and judgment were fair.  *Id.*  He diagnosed bipolar-depressed, PTSD.  *Id.*

White returned to Dr. Phillips on September 19, 2019, for right upper back and right leg pain that had been bothering her for a while.  (Tr. 667-671).  She reported that the spine institute had recommended surgery, but that she had not yet had an MRI.  *Id.*  Lyrica was not controlling her pain.  *Id.*  Phillips diagnosed low back pain with sciatica.  *Id.*  He ordered an MRI.  *Id.*

White returned to Dr. Wagner on September 24, 2019.  (Tr. 722).  She was caring for her two-year old granddaughter at that time because her 19-year old daughter was irresponsible.  *Id.*  She admitted to some passive suicidal ideation, but no plans.  *Id.*  Her thought process was organized.  *Id.*  Her mood was depressed.  *Id.*  She saw "bugs."  *Id.*  Her attention/concentration, insight, and judgment all were fair.  *Id.*  Wagner diagnosed bipolar-depression, PTSD.  *Id.*

White saw Dr. Wagner a month later on October 29, 2019.  (Tr. 721).  She reported that her mood had improved.  *Id.*  She complained about how her daughter had been acting towards her.  *Id.*  She admitted to mood swings.  *Id.*  Her mood was better, affect was fair.  *Id.*  Insight and judgment were fair.  *Id.*  She had no side effects with her medication.  *Id.*

White saw Dr. Wagner on November 26, 2019, with complaints of paranoia.  (Tr. 720).  She said that she might need to check into a facility after the holidays.  *Id.*  Her mood was

14

depressed.  *Id.*  She was positive for paranoia.  *Id.*  Wagner diagnosed bipolar-depressed.  *Id.*

White next saw Dr. Wagner on January 21, 2020.  (Tr. 719).  Her mood had been pretty good.  *Id.*  She had decreased paranoia and no new hallucinations.  *Id.*  Her insight was fair; judgment was suspect.  *Id.*  Wagner diagnosed bipolar – I, depressed.  *Id.*

White returned to Dr. Wagner on March 10, 2020.  (Tr. 718).  She reported increased stressors at home.  *Id.*  Her daughter was back at home with her child.  *Id.*  White was helping with childcare.  *Id.*  She had complaints of increased mood lability.  *Id.*  She had an improvement in her paranoia.  *Id.*

On April 20, 2020, White saw Dr. Phillips for insomnia.  (Tr. 632-635).  She was doing well on medication, with no side effects.  *Id.*  She had no other new complaints.  *Id.*

On May 19, 2020, White saw Navneet Sharma, M.D., for follow-up for back pain and medication refill.  (Tr. 704-712).  She was diagnosed with lower back pain and lumbar spondylosis.  *Id.*  Trigger point injections were administered.  *Id.*

A May 20, 2020 x-ray of the thoracic spine showed mild degenerative changes.  (Tr. 703).

Ginger Ray wrote another to whom it may concern letter on June 18, 2020, wherein she documented that White had been receiving individual counseling with Ray of Light since August 15, 2018.  (Tr. 714).  She had been learning how to cope with her PTSD diagnosis.  *Id.*  However, she struggled with obsessive negative thoughts, auditory and visual hallucinations, and sometimes catatonic behavior.  *Id.*  Ray stated that it was not feasible for White to work at that time because the stress of employment would hinder her treatment.  *Id.*

White returned to Dr. Wagner on June 23, 2020.  (Tr. 716).  She had recent family

stressors, including the death of her father-in-law the prior weekend and continued issues with her daughter and her two granddaughters. *Id.* She had depressed mood and tearful affect. *Id.* Her delusions had improved. *Id.* Attention/concentration, insight, and judgment all were fair. *Id.* He diagnosed bipolar-I, depressed. *Id.*

## Analysis

White, who is ably representing herself in this matter, set forth three assignments of error:

1. The ALJ erred by failing to recognize that her mental impairments met or equaled the criteria in the list of impairments described in 20 C.F.R., Part 404, Subpart P, Appendix 1.

2. The ALJ's mental residual functional capacity assessment is not supported by substantial evidence; and

3. The ALJ's step five finding is tainted by legal error because she failed to resolve apparent conflicts between the vocational expert's testimony and the Dictionary of Occupational Titles as required by Social Security Ruling 00-4p.

The court will address the second assignment of error first because, in this instance, it proves dispositive.

## I.    Mental RFC[5]

The relevant period at issue in this case spans an almost three-year period from the alleged disability onset date of November 5, 2017, until the date of the ALJ's decision on September 14, 2020. In her decision, the ALJ reviewed the available evidence, including the hearing testimony, the claimant's activities of daily living, treatment records, and the impressions of the treating and consultative physicians, psychologist(s), psychiatrists, and

---

[5] White did not meaningfully challenge the ALJ's assessment of the limiting effects caused by her physical impairments, and, consequently, neither will the court. Upon remand, however, the Commissioner will need to further develop the record regarding the limitations imposed by White's physical impairments.

licensed professional counselors.   (Tr. 15-18).   In deriving White's mental RFC, the ALJ

specifically addressed the medical opinion evidence.   First, and foremost, the ALJ deemed

"persuasive" the July 2018 findings of the non-examining state agency psychologist, Dr. Kahler,

because it was "consistent with the above evidence that supports non-disabling limitations."   *Id*.

In so doing, she added that White was "able to care for her granddaughter and take care of her

own household."   *Id*.

   Conversely, the ALJ determined that the opinion of licensed professional counselor,

Sherry Rumby, was "unpersuasive" because it was inconsistent with unspecified evidence from

White's "own doctor."   *Id*.   The ALJ also reiterated that, despite some mood swings and

increased depression at times, White was entrusted with the care of her two-year-old

granddaughter and professed her ability to care for her own "young son."   *Id*.

   The ALJ further determined that "the statement" from licensed professional counselor,

Ginger Ray, was "somewhat persuasive."   *Id*.[6]   Although the ALJ determined that the letter was

not a medical source opinion, she nonetheless felt obliged to consider it because the Appeals

Council had addressed it.   *Id*.   The ALJ likewise discounted Ray's June 18, 2020, letter wherein

Ray concluded that it was not feasible for White to work because the stress of employment

would hinder her treatment.   *Id*.   The ALJ explained that Ray's statement was not persuasive

because it was not a function-by-function limitation.   *Id*.

   Inexplicably, however, the ALJ did not address Ginger Ray's December 12, 2018 mental

residual functional capacity questionnaire which was a function-by-function assessment of the

---

[6]  Apparently, the ALJ was referring to Ray's September 13, 2018 to whom it may concern letter
wherein she stated that White struggled with obsessive negative thoughts, hallucinations, and
some catatonic behaviors.   (Tr. 565, 18).

effects of White's mental impairments.   (Tr. 602-604).

Finally, the ALJ noted that on June 20, 2019, White underwent a psychiatric evaluation with John Wagner, M.D., pursuant to which he assigned a "current" GAF of 60, which denoted moderate symptoms.   (Tr. 18).   The ALJ observed that the GAF rating was "not persuasive," because it only represented a snapshot opinion about the claimant's level of functioning.   *Id*. She nonetheless concluded, that "the pattern of GAFs in this case is generally consistent with the claimant having non-disabling mental limitations and improved mental status with treatment." *Id*.   However, the ALJ did not identify any other GAF ratings in this case, nor did the undersigned uncover any.

The court recognizes that "the ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion."   *Martinez v. Chater*, 64 F.3d 172, 175-76 (5th Cir.1995) (citation omitted).   However, an ALJ cannot reject a medical opinion without an explanation supported by good cause.   *See Loza v. Apfel*, 219 F.3d 378, 395 (5th Cir.2000) (citations omitted).   For claims filed on or after March 27, 2017, the Commissioner no longer affords "controlling weight" to the opinions of treating physicians and will not defer or give any specific evidentiary weight to any medical opinion(s) from the claimant's medical sources.   20 C.F.R. §§ 404.1520c(a) and 416.920c(a).   Furthermore, the fact that a medical source actually examined the claimant or specializes in an area germane to the claimant's medical issues are not primary or dispositive considerations in assessing the medical opinion.   *See* 20 C.F.R. §§ 404.1520c(c) and 416.920c(c).   Rather, when determining the persuasiveness of a medical opinion, the most important factors are supportability and consistency.   20 C.F.R. §§ 404.1520c(b)(2) and 416.920c(b)(2).

18

Only when two or more medical opinions about the same issue are both equally well-supported and consistent with the record, but "not exactly the same," will the Commissioner then articulate how she considered the "other most persuasive factors," such as the medical source's relationship with the claimant (including the length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and the examining relationship); the medical source's specialization; and other factors (including a medical source's familiarity with other evidence of the claim or an understanding of the agency's disability program's policies and evidentiary requirements).    20 C.F.R. §§ 404.1520c(b)(3)-(c) and 416.920c(b)(3)-(c).

Furthermore, under the new regulations, the Commissioner is not obliged to address every medical opinion issued by the same medical source.    20 C.F.R. §§ 404.1520c(b)(1) and 416.920c(b)(1).    "Instead, when a medical source provides multiple medical opinion(s) or prior administrative medical finding(s), [the Commissioner] will articulate how [she] considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis . . ."    *Id*.

In this case, the ALJ purported to reject Ginger Ray's statements because they addressed ultimate issues that remained within the province of the ALJ.    *See* Tr. 18; 20 C.F.R. §§ 404.1520b(c) and 416.920b(c).    Again, however, the ALJ did not mention Ray's December 12, 2018 mental residual functional capacity questionnaire at all.    (Tr. 602-604).    Moreover, although the regulations excuse the ALJ from addressing multiple medical opinions from the same medical source, the ALJ's purported rationale for discounting Ray's to whom it may concern letters cannot be extended to the December 12, 2018 mental residual functional capacity

19

questionnaire because, as its name suggests, the questionnaire *does* represent a function-by-function assessment of the effects of White's mental impairments.    Further, if the limitations in the questionnaire had been credited, then it likely would have compelled a finding of disability.

In addition, it is apparent that the ALJ patterned her mental RFC upon the 2018 findings of the non-examining agency psychologist.    The ALJ then selected a couple of instances in the subsequent medical record that appeared to be consistent with Dr. Kahler's impressions.    For example, the ALJ noted White's one-time GAF score that was consistent with moderate impairment.    However, White's treating psychiatrist at that time, Dr. Wagner, issued that GAF rating pursuant to his initial evaluation.    His subsequent records document that White's mood symptoms and hallucinations waxed and waned over the course of her treatment visits. Moreover, the record remains devoid of a "pattern" of moderate GAF scores.

The ALJ also seized upon the fact that, on one or two occasions, White disclosed to Dr. Wagner that she was caring for her two-year old granddaughter.    (Tr. 722).    However, there is no indication that this instance represented a continuing arrangement.    Similarly, the ALJ emphasized that White remained able to care for her "young son."    (Tr. 17).    At the February 6, 2019 hearing, however, White's son already was a teenager (13).    (Tr. 46).    Moreover, White's interaction with her son was limited to "get[ting] him up for school," and then talking with him. (Tr. 377).    As it turns out, White could not even help her son with his homework.    (Tr. 62).

The court is cognizant that conflicts in the evidence, including those in medical opinions, remain issues to be decided by the Commissioner, and should be upheld so long as they are supported by substantial evidence.    *Singletary v. Bowen*, 798 F.2d 818, 822–23 (5th Cir. 1986). But substantial evidence does not entail a simple search of the record for isolated bits of evidence

that support the Commissioner's decision.   *Id*.   Here, the ALJ's stated rationale for her

resolution of the disputed evidence is incomplete and unsupported.   Furthermore, the one thing

that stands out from this record is that the effects of White's mental impairments wax and wane

over time.   She has good days, and she has bad days.   Under these circumstances, the

Commissioner is obliged to determine not only whether the claimant can obtain employment, but

also whether she can maintain that employment.   *See Singletary, supra.*

In sum, the court is compelled to find that the ALJ's RFC is not supported by substantial

evidence.[7]

## II.    Step Five and Remand

Because the foundation for the ALJ's step five determination was premised upon an RFC

that is not supported by substantial evidence, the court further finds that the Commissioner's

ultimate conclusion that Plaintiff is not disabled, likewise is not supported by substantial

evidence.[8]

The courts enjoy the authority to enter, upon the pleadings and transcript of the record, a

judgment affirming, modifying, or reversing the decision of the Commissioner of Social

Security, with or without remanding the cause for a rehearing.   42 U.S.C. § 405(g).   When

---

[7] Because the undersigned's recommended disposition of the RFC issue proves dispositive, the court need not reach White's step three argument.   Upon remand, however, and after further development of the record, the Commissioner should ensure an updated and more detailed analysis of the pertinent listings at step three.

[8] Having determined that remand is required because the ALJ's residual functional assessment is not supported by substantial evidence, the court need not consider Plaintiff's additional argument premised upon the alleged conflict between the VE's testimony and the DOT.   If, upon remand, the issue recurs, then Plaintiff will have the opportunity to cross-examine the VE regarding the alleged conflict at the hearing.

reversal is warranted, the matter is remanded with instructions to make an award only if the record enables the court to conclusively determine that the claimant is entitled to benefits.    *See Ferguson v. Heckler*, 750 F.2d 503, 505 (5ᵗʰ Cir. 1985); *see also Rini v. Harris*, 615 F.2d 625, 627 (5th Cir. 1980) (reversing and remanding with direction to enter judgment where the evidence was not substantial, and the record clearly showed the claimant's right to benefits).

The instant record is not so disposed.    White's residual functional capacity assessment remains indeterminate.    Upon remand, the Commissioner may seek to obtain a medical source statement from White's treating psychiatrists, Drs. Guillaume and Wagner.    They both treated White over a period of time and should have an unparalleled longitudinal picture of the effects of her impairments.    Thereafter, if warranted, a further consultative examination may be obtained, with an associated medical source statement, and/or the ALJ could issue interrogatories to a psychological consultant.

## Conclusion

For the foregoing reasons,

IT IS RECOMMENDED that the Commissioner's decision be REVERSED and REMANDED pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings consistent herewith.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.    A party may respond to another party=s objections within **fourteen (14) days** after being served with a copy thereof.    A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of

22

filing.   Timely objections will be considered by the District Judge before a final ruling issues.

**A PARTY=S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

In Chambers, at Monroe, Louisiana, on this 20th day of July, 2022.

KAYLA DYE MCCLUSKY
UNITED STATES MAGISTRATE JUDGE

23